No. 40.

E. CONERY & SON *v.* EUGENE WAGGAMAN *et al.*

1. The titles and indices used by the editors of the Codes and Statutes, while no portion of the law, may serve in cases of doubt as going to show the meaning usually assigned to particular words or expressions.

2. Under our Code the distinction between laws which are odious and laws entitled to favor, with a view to narrowing or extending their construction, cannot be made by the courts. C. C. Art. 20.

3. The term "mesne process" has been adopted into American legal terminology with a wider application than that accorded it under the old English law.

4. The term, as used in R. S. Sec. 3579, does cover the writ of sequestration as known to our law, and sheriffs may demand bonds of indemnity before executing the same.

5. Judges should avoid pride of opinion, and acknowledge freely and correct fully all errors into which they may fall.

*Appeal from Sixth District Court. Rightor, Judge.*

*Bentinck Egan* for plaintiff.
*T. & J. Ellis* for defendants.

MCGLOIN, J.—This case presents features similar to those of Clavarie & Noble against same defendants, lately decided, in which we have determined to accord a rehearing. We decided in the opinion read in that case that the writ of sequestration, as known to our law, was not covered by the words

" mesne process," as used in section 3579 of the Revised Stat-
utes of this State.   We arrived at this conclusion after a careful
study of the signification of the words " mesne process" under
the English law, and satisfied ourselves that the writ in ques-
tion was not covered by that term as used in the common law
of England.   No attempt has been made in this case to show
error in this conclusion, but, on the contrary, its soundness
seems conceded.   The question is, however, here presented as
to whether the term " mesne process " has not made its way
into American judicial terminology with a different and more
extended signification, such as does include the writ in ques-
tion; and whether it was not from this latter rather than the
old English law that the term was taken by the Legislature of
Louisiana.   A careful examination of such authorities as have
been accessible to us, inclines us to the opinion that the answer
to this question must be an affirmative one.

By the United States Bankrupt Law of 1867, Sec. 5044, the
judge or register passed all the property of the bankrupt over
to the assignee, " although the same is then attached, *on mesne
process*, as the property of the debtor." In this respect it
differed from the Bankrupt Acts of 1800 and 1841, which
respected liens already fixed, making no reference to such
attachments.

Under those older bankrupt laws much litigation arose as to
what constituted a lien, such as contemplated by the saving
clauses in said acts.   It seems that in the New England States
there has existed for a long period a writ of attachment having
many points of similarity to the attachment known to our own
law.   The question was frequently presented for judicial deter-
mination, whether these attachments were to be respected under
said acts.   In the great majority of the authorities arising from
the litigation of this issue these writs have been designated as
" attachments under *mesne process*." Peck *v.* Jenner, 7 How-
ard, 612; Davenport *v.* Tillon, 51 Mass. (10 Metcalf) 321 ;
Kittridge *v.* Warren, 14 N. H. 518; Downer *v.* Brackett, 21
Vermont, 599; Wallace *v.* Treadwell, 6 Pick. 455; Atlas Bank

*v.* Nahant Bank, 23 Pick. 488; *Ex parte* Foster, 2 Story 140; *In re* Bellows & Peck, 3 Story, 428; *In re* Cook, 2 Story, 376.

And under the last Bankrupt Act the question as to what constituted an attachment under mesne process, as mentioned therein, has been often presented. In the case of *In re* Joslyn, 2 Bissel, 235, it was held that a distress warrant, issued under the statutes of Illinois, for rent, although not an attachment under mesne process, was in the nature of, or equivalent to, such an attachment. This case was followed and approved in Morgan *v.* Campbell, 22 Wall. 394. In Corner *v.* Mallory, 31 Md. 469, the court held an attachment against a foreign debtor to be an attachment under *mesne process.* In Mixer *v.* Excelsior Co. 65 N. C. 552, the court held that an attachment under the laws of North Carolina is *prior to final judgment*, and, therefore, mesne process. Pennington *v.* Lowenstein, 1 B. R. 570 is to the effect that all process issued in a suit prior to execution is *mesne process.*

We find also in the Acts of Congress, approved August 1st, 1842, and June 17th, 1844 (5 Stats. at Large, 498 and 678), the writ of arrest as existing in the District of Columbia, and somewhat similar to our own writ of the same name, regulated under the designation of "writs of arrest on *mesne process.*" So, also, Sedgwick on the Measure of Damages, Chap. XXI, p. 513 *et seq*, treats of actions against sheriffs for failure to execute *mesne process*, and cites cases of arrest of the debtor and a case of replevin (p. 520) as being covered by the term in question.

Coming within our own State, the sense in which this term was, and is held, appears from several circumstances. In Greiner's Code of Practice the title given to that section which regulates the conservatory writs is in these words: "Conservatory, or *Mesne Process.*" In the indices of the Codes of Practice, published by Greiner, Fuqua and Voorhees, the articles relating to these writs are given under the heading "Mesne Process." Although such title-heads and indices may not constitute any portion of the legislation to which they may be attached by the editors or publishers, yet the gentlemen named

were all eminent in the profession, and their course in this connection goes to show the opinion of the bar as to the sense and meaning of the term. Indeed, the Code of Greiner, dating from before the origin of the legislation under examination and in general use at the date of its original enactment, must have been potent in shaping a general conception of the signification of the term *mesne process*, and may be justly supposed to have led the Legislature to use the same with the meaning which had been thus accorded to it.

So, in Fluornoy v. Milling, 15 La. An. 473, while the Court does not directly pass upon this issue, although presented, yet it is evident that neither court nor counsel doubted the application of the legislation under discussion to the writ of sequestration, and the court declares that bonds of indemnity, given under such legislation cover the damages resulting from the act of seizure, as well as from the detention of property taken.

We have, therefore, come to the conclusion that the term "mesne process," as now used in this country, and particularly in this State by Bench and Bar has not the restricted meaning given in Bouvier, and taken from the English law, but that it is used to cover any writ issuing in the course of a litigation outside of the summons or citation and before judgment. That this is a deviation from the original meaning, we believe; but living languages are subject to change with time, and we cannot expect or compel legal nomenclature to remain immutable. Civil Code, articles 15 and 1947, require us to accord to technical terms and phrases their *received* meaning with those learned in the art, trade or profession to which they refer, and this we propose to do.

It is true that the Legislature did a vain thing in allowing sheriffs to demand a bond of indemnity in cases such as this, where they are ordered by the court to seize specific property, and incur no liability by complying with the order; and that plaintiffs are needlessly harrassed thereby; and that the Legislature must have been ignorant or forgetful of these principles when enacting this law, but all this is no concern of the courts.

Our only mission is to seek for and enforce the legislative intent, and for its folly, if any, we are not responsible. Should hardships be inflicted, as has been done in this case, the fault lies with the legislator, and a remedy must be sought at his hands. Article 20 of our Civil Code is to the effect that "the distinction of laws, into odious laws and laws entitled to favor, with a view to narrowing or extending their construction, cannot be made by those whose duty it is to interpret them." We propose to respect this provision and restrain ourselves strictly within the boundaries of our power, which is interpretative and not legislative.

It is the sacred duty of judges to avoid all pride of opinion, and to acknowledge freely and correct fairly every mistake. In this manner alone can they render impartial justice or give value to their opinions as precedents. We must, therefore, recede from the conclusion reached in the case of Clavarie & Noble, and in this case affirm the judgment of the court *a qua*, which was for defendants.

Rehearing refused.